An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-945

Filed 5 August 2026

Gaston County, Nos. 20CR052831-350, 22CR002162-350

STATE OF NORTH CAROLINA

v.

JUSTIN ISAIAH BESS, Defendant.

Appeal by defendant from judgments entered 2 November 2023 by Judge Robert C. Erwin in Superior Court, Gaston County. Heard in the Court of Appeals 26 August 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Teresa M. Postell, for the State.*

> *Assistant Public Defender Max E. Ashworth III for defendant-appellant.*

STROUD, Judge.

Defendant Justin Isaiah Bess appeals from two judgments entered after a jury found him guilty of first-degree murder and possession of a firearm by a felon. The jury found Defendant guilty of first-degree murder under both theories presented to it: premeditation and deliberation and felony murder. On appeal, he argues that the trial court erred by not instructing the jury on second-degree murder. Because the

State's evidence established "each and every element of first-degree murder and there is no evidence to negate these elements," the court properly "exclude[d] second-degree murder from the jury's consideration." *State v. Leazer*, 353 N.C. 234, 237, 539 S.E.2d 922, 925 (2000) (citation omitted). We therefore find no error.

## I. Background

A Gaston County grand jury returned indictments on 18 May 2020 and 3 July 2023, charging Defendant with first-degree murder and possession of a firearm by a felon. Defendant was tried in Superior Court, Gaston County, from 23 October 2023 to 2 November 2023.

The State's evidence at trial tended to show that Jaqualus Glover was twenty years old and lived with his mother and younger brother, Corion. He had known Defendant for years, and they were best friends. On 19 March 2020, Glover was in the car with Corion when Defendant called. Glover answered on speaker phone so Corion could hear Defendant's voice. Defendant sounded "mad"; called Glover a "snake"; and said the two could "fight it out, shoot it out, whatever." Corion was not worried; Defendant and Glover "always fell out and got back cool" within a couple hours. Glover stayed "calm" and asked Defendant "what was going on." At that time, Defendant did not indicate why he was mad.

Glover asked Corion to take him to see Defendant, but as they were leaving, Glover's friend Brandon arrived, so Glover rode with Brandon instead. Although Glover usually carried a gun, that day he had only his cell phone. Brandon was

unarmed too. Glover told Corion that he and Brandon would meet him at the park to play basketball after they met Defendant at his apartment.

Shortly before the call, Defendant had received a text and video from his friend, Elazja Gingles, asking, "Look familiar to you?"; a photo showed items stolen from Defendant's apartment. Defendant texted his cousin, Hafees Adams, and told him to bring the gun Defendant kept at Adams's house—he stored his guns there because he was a convicted felon. Adams got the gun and, on the way to meet Defendant, picked up Maleek Anderson and a man known as Kemo.[1] All three were armed. Adams drove them to get Defendant.

When they picked Defendant up, Adams handed him the gun. Defendant told the group he had discovered who had broken into his apartment in February; he had previously accused others, including Adams. Defendant chose Brownstone Court as the meeting place—a street wooded on both sides, with "no houses close to it." He then called Glover, who was riding with Brandon toward Defendant's apartment complex, and asked to meet instead at a nearby spot "on a back road." Defendant also asked whether anyone was with Glover; Glover said that Brandon was. Glover expected Adams to be with Defendant, but Brandon did not know Adams. Brandon did not think either man seemed angry.

When Glover and Brandon arrived, Adams's car was parked on the left side of

---

[1] Police were never able to determine who Kelo Proctor was.

the road, and Defendant sat on its hood with his hoodie pulled over his head. Adams, Anderson, and Kemo had walked to the woods to smoke. Brandon parked on the right side, ten or twenty feet from Defendant, and saw no one else in Adams's car.

Glover got out and walked to Defendant; Brandon stayed in the car. The two talked for a few minutes, and Defendant held up his cell phone to show Glover something. Adams, watching from the woods, saw Defendant point at the phone in an accusing manner. Glover "shrugged," but his hands stayed down; he did not reach for his pocket or move toward Defendant. Glover glanced back toward Brandon, and "as soon as he started to look back at [Defendant,] [Defendant] pulled out a gun and started shooting."

After three or four shots, Glover tried to run, but he fell as he turned. As he lay on his back, Defendant stood over him and kept shooting. Defendant then looked at Brandon, who lowered his window, asked Defendant why he did that, and put his car into reverse. In his backup camera, Brandon saw another person come up from behind his car and "realized that the person was shooting from behind [him], and [he] started to drive off in reverse." With glass shattering around him, Brandon "jumped the curb" and did "a 180 turn around and got out of there."

Adams was the person behind Brandon's car. He thought he saw Brandon "reaching down," believed "he [wa]s going to try to shoot [Defendant] or [Adams]," and "started shooting at the car." Anderson and Kemo joined in. Brandon never fired back. Adams saw Brandon "crash[ ] the car" against the curb about fifty yards up the

road; thinking Brandon was dead, he ran back to his car.

Before they left, Defendant took Glover's phone from his shorts, then jumped into the back seat, and they drove away. Defendant left Glover's phone in Adams's car, and everyone put their guns in the trunk. Defendant began crying, saying, "I can't believe I just killed my best friend." Adams dropped off Defendant first, then Kemo and Anderson. Defendant took Adams's "9"—his 9 mm gun—when he got out; the others took their own guns. Later, Adams "got rid of" Glover's phone and Defendant's Mac-10 by throwing them "in Lake Wylie, South Carolina." Neither was recovered.

Brandon drove about three miles from the scene, called 911, and waited for law enforcement to arrive. He had been injured by glass from the windows but no bullets had hit him. His car was totaled: the front headlight was out, the back left tire was flat, the rear windows were "busted out," and the car had bullet holes in at least nine places.

Officers reached the scene about two minutes after the call came in. They attempted CPR and used a defibrillator on Glover, but he had no pulse. EMS arrived and covered him with a sheet.

According to the medical examiner, Glover suffered sixteen gunshot wound injuries: fifteen "distinct true entry wounds," other wounds where bullets may have "exited and re-entered," eleven exit wounds, and four projectiles lodged inside his body. Glover died from his many bullet wounds, though not immediately; he inhaled

blood into his throat and likely felt pain as he died.

Investigators determined that four firearms were used at the scene: two 9 mm and two .40 calibers. Every bullet that struck Glover was consistent with the 9 mm class and was fired from the same gun.

Officers arrested Defendant soon after the shooting. He was sitting in a car in the parking lot of his mother's apartment complex with a 9 mm gun under the driver's seat and a .40 caliber magazine in the car. Defendant claimed to have no idea why the officers were there and said he had been at home all day. But Defendant wore an ankle tracking device, and GPS tracking showed he had been at Brownstone Court from 7:05 to 7:15 p.m. that day.

After initially denying the shooting, Defendant confessed to killing Glover—to an officer and in recorded jail phone calls. Although Defendant talked to his girlfriend and his mother several times, he never said he was defending himself. When they asked why he shot Glover, he answered, "because he broke into our apartment." He also asked his girlfriend to "make it where [Brandon] can't take the stand."

Defendant testified in his own defense. His evidence tended to show that he and Glover had been "best friends" since seventh grade. About a month before the shooting, someone broke into the apartment Defendant shared with his girlfriend; the burglars stole several items, including a pair of Defendant's shoes. A neighbor had seen "two people come out with boxes" that day, and muddy footprints covered the floor. Defendant suspected that more than one person had broken in.

On 19 March 2020, Defendant received the text and video from Gingles asking, "look familiar to you?" The video showed items taken from his apartment. Defendant began scrolling through his phone and found, on Facebook or Snapchat, a video of a person in the "front seat with money on their lap, and when turned to the passenger, it was [Glover]." "He had a gun in his lap and [Defendant's] shoes on." Defendant recognized the shoes as "Chinese man 13's [sic]"—a blue stain marked the white part—so he knew they were his. He also knew that Glover had just bought a new gun. Angry, Defendant called Glover and said, "tell me it ain't true," and texted him as well. Glover denied breaking into Defendant's apartment.

Defendant had suspected Glover even before he saw the video online. When he had seen Glover after the break-in, he could "feel the tension" and knew something was wrong. After seeing his shoes online, Defendant told Glover that they "need[ed] to talk in person" so he could "read body language" and test whether his instincts were correct. He asked Glover to come to his apartment, then texted Adams to "bring [his] shit"—"[i]t was a typo," he testified. He meant to type "shot," meaning "bring [his] firearm." Defendant explained that "with anything [he] d[id]," such as trading "shoes and stuff like that, [he] ha[d] [his] protection on [him]" to keep him from "being shot at, robbed, and all that." The gun he asked Adams to bring was his Cobray Mac-11, admitted into evidence as State's Exhibit 25A. The gun was so heavy that "you could not have it in your pocket and you had to have it on something."

Defendant wanted his gun because, even before the shooting, "tension . . . was

already in the area." He thought "something [wa]s going down"—Glover could have been "with his crowd or something." Adams arrived with the gun, and they drove to meet Glover; Maleek and Kemo were also in the car. Defendant wanted to meet "in front of the apartment in the cul de sac before you come in the apartment [complex]." He knew they "were probably going to fight so [he] didn't want have firearm stuff, [he] didn't want to because the neighbors, they walk dogs, do all that." He also did not want his mother to get "kicked out" of the apartment.

But Adams did not drive to the cul-de-sac; he drove to another location on Brownstone Court. After Adams parked, he and the others got out, but Defendant did not know where they were going—he was talking to Glover on Facetime and focused on that conversation. He sat on the hood waiting for Glover, feeling "betrayed" because Glover was supposed to be his friend.

Defendant saw a black car pull up; Glover got out of the front seat and walked toward him. Defendant did not recognize the driver. The car had parked about half a football field away. Defendant placed his gun on the seat of the car with the door open. When Glover approached, Defendant got off the hood and stood by the open door. He wore a hoodie but denied having the gun in a pocket or his pants—it was too big.

Defendant asked Glover if he had anything to tell him. Glover said, "what are you talking about?" Defendant showed him the Facebook video of Glover and his new gun: "tell me those are not mine. Tell me that is not you." Glover said he was tired

of hearing about it—and that he did it. Defendant then realized that both Glover and Gingles had broken into his apartment.

Defendant testified that at that moment, "we ha[d] multiple firearms, you know what I'm saying." Glover wore shorts and a shirt, and Defendant thought he "may have had a 380 in his pocket." Defendant still did not know who was driving the car, and he was "always on alert" because of "past events in [his] life." He told Glover that if he broke into his house, they would "fight, and that will be it, but [Glover] was, like, yes, what you going to do about it." Defendant testified that Glover was "popping pills" and doing drugs at that time, though Defendant had been drinking and doing drugs that week too. Defendant thought he saw Glover "trying to turn around and signal someone to come or reach and grab anything," and because he was "always on alert," he "reached and shot him."

Glover never pulled a gun, but Defendant did not wait to see what he was doing because "numerous times [he] ha[d] been shot at." Defendant had been shooting with Glover before, knew Glover was "capable of shooting somebody if he pull[ed] out a gun," and thought that Glover was going to shoot him. Defendant "fired until [Glover] hit the ground," then stopped. He believed he shot "around ten times," though the Mac had a "special trigger" so "you c[ould] shoot it one time but two bullets would come out." Glover fell on his back. After Glover stopped moving, Defendant "grabbed his hand to see what he was reaching for" and discovered it was Glover's phone.

Afterward, Defendant was "in a daze"; someone grabbed him and pushed him

into the car. He left the gun and Glover's cell phone on the seat and started crying. He asked Adams to drop him at home, and Adams told him not to worry about the gun. Not wanting his mother to see him in that state, Defendant asked her to go to the store "to get him something to smoke." He then sat outside in his car with a bottle of liquor, "calling people" as people called him—all while wearing his ankle monitor. The police arrived, got him out of the car, told him he had violated his curfew, and "took [him] to the station."

During the interrogation, Defendant initially lied, making up fake names of others involved "to save [his] friends." But when another officer came to transport him, Defendant felt like he was "going to go crazy" and confessed.

After both parties rested and gave their closing arguments, the trial court instructed the jury on first-degree murder under two theories—premeditation and deliberation and felony murder—and on voluntary manslaughter. It also instructed on perfect and imperfect self-defense, and on possession of a firearm by a felon.

On 2 November 2023, the jury found Defendant guilty of first-degree murder under both theories and possession of a firearm by a felon. The trial court sentenced Defendant to seventeen to thirty months for the possession conviction, followed by life without the possibility of parole for the murder conviction. Defendant gave oral notice of appeal.

## II.  Jurisdiction

This Court has jurisdiction under North Carolina General Statute Sections 7A-

27(b)(1) and 15A-1444(a). *See* N.C. Gen. Stat. § 7A-27(b)(1) (2025) ("[A]ppeal lies of right directly to the Court of Appeals . . . [f]rom any final judgment of a superior court. . . ."); *see also* N.C. Gen. Stat. § 15A-1444(a) (2025) ("A defendant who has entered a plea of not guilty to a criminal charge and who has been found guilty of a crime is entitled to appeal . . . when final judgment has been entered.").

## III.    Preservation Issue

Defendant's only argument on appeal is that the trial court erred by failing to instruct the jury on second-degree murder. The State argues that Defendant did not request the instruction and did not preserve any objection to the instructions as given.

"To properly preserve an objection to a jury instruction, the appellate rules require that a party object before the jury retires to consider its verdict and state 'distinctly that to which objection is made and the grounds of the objection.' " *State v. Leaks*, 379 N.C. 57, 61–62, 864 S.E.2d 217, 220 (2021) (citing N.C. R. App. P. 10(a)(2)).

Defendant contends that he requested a second-degree murder instruction, citing transcript pages where, he says, he "filed a written request for jury instructions and specifically requested a second-degree murder instruction." On those cited pages, the trial court states that it had sent counsel a draft of the proposed jury instructions, which did not include second-degree murder. The transcript reflects no written request from Defendant at that point. The court then asked the State and Defendant for the potential verdicts in the case, and Defendant's counsel responded:

I believe the jury could find first degree. I believe the jury could find second degree. I believe the jury could find voluntary manslaughter. I believe the jury could find not guilty.

I know the State didn't ask for second degree, and your Honor did not put in second degree in his initial, but second degree is killing another person with malice without premeditation and deliberation and all that. If the jury believes that [Defendant] at that moment, at that period of time, that [Defendant] just got angry, went and got his gun and killed, that is second degree. It is not first degree. That is why I am bringing it up, and that's why I believe those are the potential verdicts.

As to the felony possession of firearm by felon, guilty or not guilty. And again, I object about anything about the felony murder rule, but the way your Honor did put it in there last night with the self-defense, . . . Defendant does agree with that if you decide to include felony murder in the instructions.

The trial court asked for "the State's position" on a second-degree murder instruction. The State did not object, responding: "That's fine, your Honor. If your Honor thinks it is appropriate." Defendant's counsel then stated:

The problem with sitting here at the table and doing everything and trying, I didn't hear all the evidence, so if you believe there was evidence there of that, of second degree. If you don't believe there is enough evidence, then I will leave it in your Honor's discretion.

Based on this exchange, the State asserts that Defendant abandoned his request for a second-degree murder instruction.

But the colloquy did not end there. A few transcript pages later, the trial court noted that it had "received some additional requests from both the State and the

[d]efense,"[2] and the parties discussed a proposed self-defense instruction from the State. During that discussion, Defendant's counsel stated: "May I approach, your Honor? I am handing up . . . Defendant's proposed instructions." Counsel and the court then discussed how the self-defense instructions interacted with the felony murder instructions; indeed, most of the jury-instruction discussion was devoted to self-defense. After the court sent revised instructions to counsel, and after further colloquy, Defendant raised no additional objections.[3] And after the court instructed the jury, Defendant had no new objections, but he did "renew" his objections as previously stated.

The transcript does not reveal the contents of the proposed instructions Defendant handed up, but our record includes "Written Proposed Jury Instructions" from Defendant. The State describes this document as an "unfiled copy" of a "proposed jury instruction in place of [North Carolina] [P]attern [J]ury [I]nstruction 206.10." *See* N.C.P.I. – Crim. 206.10 (First-degree murder where a deadly weapon is used, covering all lesser included homicide offenses and self-defense). The proposed instructions address the application of self-defense to first-degree murder, second-degree murder, and voluntary manslaughter—so they do include second-degree

---

[2] The record does not show what the "additional requests" were or when the court received them, but the ensuing discussion suggests they dealt with self-defense.

[3] The trial court mentioned Defendant's "request about the photo ID instruction," which based on the trial court's comments, was four pages long. Our record contains no proposed instruction on photo ID. Counsel responded, "that was not necessarily a request for that" and did not ask that the instruction be included.

murder. The State did not object to including these "unfiled" proposed instructions in the record, and their substance tracks the colloquy about the self-defense instructions. We thus assume that the proposed instructions in our record are what Defendant presented to the trial court to request an instruction on second-degree murder.

On this record, Defendant did enough to preserve the issue. True, his counsel offered little argument for the instruction and, after the State declined to object, said only, "I will leave it in your Honor's discretion." But counsel submitted a written request that included the instruction and renewed his objections after the court instructed the jury. *See Leaks*, 379 N.C. at 62, 864 S.E.2d at 220 (holding that the defendant "properly preserved his objection" by requesting a modification to the jury instructions and renewing his objection after the trial court delivered the unmodified instructions). We accordingly reach the merits.

## IV.  Standard of Review

When a defendant "properly preserve[s] her challenge to jury instructions," this Court "reviews the trial court's decisions regarding" those "instructions *de novo*." *State v. Richardson*, 270 N.C. App. 149, 152, 838 S.E.2d 470, 473 (2020) (citation and omitted).

> On appeal, a defendant is required not only to show that a challenged jury instruction was erroneous, but also that such error prejudiced the defendant. A defendant is prejudiced . . . when there is a reasonable possibility that, had the error in question not been committed, a different

- 14 -

> result would have been reached at the trial out of which the
> appeal arises.

*Id.* (internal citations and quotation marks omitted).

## V. Second-Degree Murder Jury Instruction

The jury convicted Defendant of first-degree murder under both theories submitted, and Defendant challenges both on appeal. As the State notes, "[b]ecause the jury convicted [D]efendant of both premeditated and felony murder, [he] cannot show prejudice without demonstrating the jury's verdicts regarding both premeditated and felony murder were the result of reversible error." *State v. Phipps*, 331 N.C. 427, 459, 418 S.E.2d 178, 195 (1992) (upholding the defendant's "first-degree murder conviction under the felony murder rule" and holding that he was "not entitled to a new trial" because "the jury based its verdict on both premeditation and deliberation and the felony murder rule"). In the State's view, Defendant cannot "meet his heavy bilateral burden in this case." We begin with the premeditation theory, because if the trial court properly refused the second-degree murder instruction there, we need not reach felony murder.

Defendant contends that "[t]he trial court erred when it refused to submit an instruction for second-degree murder, a lesser-included offense of premeditated and deliberate first-degree murder." The evidence supported that verdict, he argues, because he "did not even have a gun on his person when he was initially speaking to Glover" and reached for it only when he thought Glover was going to shoot him.

According to Defendant, he brought the gun only for protection, because "Glover was known to rob people, use drugs, and carry firearms." And Defendant's intent was only to "speak to Glover about the items stolen from his apartment, not to kill him."

A defendant is entitled to have a lesser-included offense submitted to the jury "only when there is evidence to support it." *State v. Covington*, 248 N.C. App. 698, 702, 788 S.E.2d 671, 675 (2016) (citation omitted).

> The test in every case involving the propriety of an instruction on a lesser grade of an offense is not whether the jury could convict defendant of the lesser crime, but whether the State's evidence is positive as to each element of the crime charged and whether there is any conflicting evidence relating to any of these elements.
>
> The trial court is not obligated to give a lesser included instruction if there is no evidence giving rise to a reasonable inference to dispute the State's contention. Where no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process.

*Id.* (citations omitted). Put another way, an "instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater." *State v. Millsaps*, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002). "For evidence to be 'in conflict,' there must be evidence that tends to negate the State's positive evidence as to the elements of the crime," and such conflicts may arise from evidence introduced by the State or the defendant. *State v. Wilson*, 385 N.C. 538, 543, 895 S.E.2d 355, 361 (2023) (citation omitted).

These principles apply to second-degree murder as a lesser-included offense of premeditated first-degree murder:

> First-degree murder is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. Second-degree murder is a lesser included offense of first-degree murder. If the [S]tate's evidence establishes each and every element of first-degree murder and there is no evidence to negate these elements, it is proper for the trial court to exclude second-degree murder from the jury's consideration.

*Leazer*, 353 N.C. at 237, 539 S.E.2d at 924–25 (internal citations and quotation marks omitted). Defendant does not argue that the evidence fails to support the elements of premeditated and deliberate first-degree murder; he argues that a conflict in the evidence would have permitted the jury to rationally find him guilty of second-degree murder. The question, then, is whether any evidence tended to negate premeditation and deliberation. *See Wilson*, 385 N.C. at 543, 895 S.E.2d at 361; *see also Leazer*, 353 N.C. at 237, 539 S.E.2d at 924–25.

Defendant claims that, as in *Phipps*, the evidence here permitted a finding of malice without premeditation and deliberation. In *Phipps*, the victim managed a restaurant, and her duties included making bank deposits after closing. 331 N.C. at 432, 418 S.E.2d at 180. She was found dead from "blunt and sharp force injuries" not long after she left one night to make a deposit. *Id.* After police identified the defendant as a suspect, and he told them "some fabrications," he admitted

- 17 -

responsibility for the victim's death. *Id.* at 434, 418 S.E.2d at 181. By his account, he was working at the restaurant that night; the victim asked him to put a box in her car, and he then "rode around" in his own car, smoking pot and drinking beer. *Id.* At about 10:45 p.m., he returned, and the victim asked him to ride with her to make the deposit. *Id.* He agreed. In the victim's car, the defendant asked how much money she had, and after she said "thirty-some hundred," he asked if he could have it. *Id.* She said "no," and after they drove to the bank, he asked again, saying he really needed the money because he was about to lose his house. *Id.* She said "Hell, no!" and started to get out, but the defendant pulled her back into the car by her hair. *Id.* She "smacked him" and he hit her back; she tried to hit him with a ratchet, but he blocked it, grabbed it, and hit her with it. *Id.* at 434–35, 418 S.E.2d at 181. She then produced a knife; he wrestled it away and stabbed her in the neck. *Id.* at 435, 418 S.E.2d at 181. He got the money bag, grabbed the ratchet and her keys, and ran to his own car. *Id.*

Our Supreme Court held that the trial court erred by refusing to instruct on second-degree murder because "the jury could have concluded that [the] defendant killed the victim with malice but without premeditation and deliberation." *Id.* at 459, 418 S.E.2d at 195. Specifically, the Court reasoned that

> [t]he jury could have concluded that defendant carried no
> weapons with him when he went to the bank with the
> victim, and that he merely tried to take the money bags
> from her with permission or with the force of his own
> hands. If the jury believed his statement, it could have

- 18 -

> concluded that defendant only killed the victim as a result of the struggle that ensued after defendant pulled the victim back into the car and after the victim escalated the struggle by using deadly weapons to defend herself.

*Id.*

This case, as the State argues, is "vastly different" from *Phipps*. Even assuming the truth of Defendant's testimony that he did not have the gun on his person—the State's evidence tended to show otherwise—his own testimony established that he prepared for the meeting by arming himself. He asked his cousin to bring him a specific gun—a gun he stored at his cousin's house because, as a convicted felon, he could not legally possess it. And because he feared that Glover and the driver of Glover's car would be armed, he kept the gun immediately available on the car seat, standing by the open car door, as Glover approached. The *Phipps* defendant, by contrast, brought no weapon at all; he killed with weapons he took from the victim as she defended herself. *Id.* at 434–35, 418 S.E.2d at 181. Where the *Phipps* defendant's account showed an unplanned killing arising from an escalating struggle, Defendant's account showed a meeting he armed himself for in advance.

Nor does Defendant's testimony otherwise conflict with the State's evidence on premeditation and deliberation. His counsel told the trial court a second-degree murder instruction might be justified "[i]f the jury believes that [Defendant] at that moment, at that period of time, that [Defendant] just got angry, went and got his gun and killed." But Defendant did not testify that he shot Glover in anger. He testified

that he was upset over the break-in and felt betrayed by Glover, but not that he shot him for those reasons. His testimony was clear that he believed Glover was reaching for a gun or signaling the driver to shoot, so he shot in self-defense. Indeed, self-defense was his primary argument at trial, and on appeal much of his argument—that "he shot Glover because he thought it was necessary to save his life"—simply restates it. That theory was fully presented to the jury: the trial court instructed on both perfect and imperfect self-defense, giving the jury the option to acquit Defendant based on self-defense or to find him guilty of voluntary manslaughter if "he killed the alleged victim by intentional and unlawful act" while "acting in self-defense and us[ing] excessive force." The jury rejected that theory, and Defendant raises no challenge to those instructions on appeal.

In short, the only conflict in the evidence was over self-defense: Defendant told the jury he shot to protect himself, while the State's evidence showed he never claimed self-defense to police, family, or friends after the shooting.[4] That conflict supported instructions on self-defense and voluntary manslaughter—instructions the trial court gave. It did not "negate the elements" of premeditated and deliberated first-degree murder, so it did not support an instruction on second-degree murder. *Leazer*, 353 N.C. at 237, 539 S.E.2d at 925.

_____

[4] The State presented voluminous evidence from the other men involved, including Brandon and Adams; text messages between them and Defendant on the day of the shooting; and recorded jail calls between Defendant and family members and friends.

Because Defendant has failed to show that the trial court erred by not instructing the jury on second-degree murder as to premeditated and deliberate first-degree murder, we need not address his argument as to felony murder. *See Phipps*, 331 N.C. at 459, 418 S.E.2d at 195.

## VI.    Conclusion

For the reason explained above, we find no error.

NO ERROR.

Chief Judge DILLON and Judge GORE concur.

Report per Rule 30(e).